IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-01351-MEH

NICOLE ORTEGA, on behalf of herself and all similarly situated persons,

 Plaintiff,

v.

DENVER INSTITUTE L.L.C., a Nevada limited liability company, d/b/a Aveda Institute Denver, and
DALE L. LEMONDS,

 Defendants.

---

## ORDER ON MOTION FOR SUMMARY JUDGMENT

---

**Michael E. Hegarty, United States Magistrate Judge**.

 Before the Court is Defendants' Motion for Summary Judgment (hereinafter "MSJ") [filed April 15, 2015; docket #28]. The motion is fully briefed, and oral argument would not materially assist the Court in its adjudication. For the reasons that follow, the Court **grants** the Defendants' motion.[1]

## BACKGROUND

### I. Procedural History

 Plaintiff initiated this action, on behalf of herself and all similarly situated persons, on May 14, 2014, against Denver Institute L.L.C., doing business as Aveda Institute Denver ("AID"), and owner Dale L. LeMonds. Complaint, docket #1. Plaintiff claims Defendants violated the Fair Labor

---

[1]Pursuant to 28 U.S.C. § 636(c) and the Pilot Program to Implement the Direct Assignment of Civil Cases to Full Time Magistrate Judges, the parties consented to the jurisdiction of this Court to conduct all proceedings in this civil action. Docket #13.

Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, Article XVIII, § 15 of the Colorado Constitution, and Colorado's Minimum Wage Act (Colo. Rev. Stat. § 8-4-101, *et seq.*), as implemented by the Colorado Minimum Wage Order (Colo. Rev. Stat. § 8-6-101, *et seq.*). *See* Complaint at 1, 9. Defendants filed an Answer on June 11, 2014. Answer, docket #8. Defendants filed the present MSJ on April 15, 2015. Docket #28. Plaintiff sought and the Court granted an extension for the Response, which Plaintiff then timely filed on June 1, 2015. Dockets ##29, 30, 35. Defendants timely replied on June 15, 2015. Reply, docket #36.

Essentially, Defendants contend that Plaintiff cannot establish any genuine issue of material fact to allow her to proceed to trial and therefore assert "[t]his case presents a straightforward and simple legal question: are full-time cosmetology students, most of whom receive federal financial aid, considered 'employees' when performing the clinical work required by Colorado law to obtain their cosmetology licenses?" MSJ at 2. Plaintiff argues that "whether Plaintiff was an employee under the FLSA presents an issue of law, albeit one dependent upon the facts." Response, docket #35 at 11. Plaintiff further asserts that "[i]t is not the 'performing of clinical work' (whether required or not by the State of Colorado) by Plaintiff that gives rise to this case . . . [but rather] it is Defendants' sale of that 'work' to the public for pecuniary gain that violates the FLSA and Colorado law." *Id.* at 2.

## II.    Findings of Fact

The Court makes the following findings of fact viewed in the light most favorable to the Plaintiff, who is the nonmoving party in this matter.

1.      To work as a cosmetologist in Colorado, one must first obtain a license. Colo. Rev. Stat. § 12–8–120. Practicing cosmetology without a license in Colorado is a class-two misdemeanor, and

a class-six felony on the second offense.  *Id.* § 12-8-127.

2.      To obtain a cosmetology license, one must first graduate from a "beauty school" approved by the Colorado Department of Higher Education's Division of Private Occupational Schools ("DPOS") and pass a cosmetology examination administered by the State.  *Id.* §§ 12-8-114(2)-(4). A "beauty school" is defined as an "establishment operated . . . for the purpose of teaching cosmetologists . . . that is certified by [DPOS] . . . ."  *Id.* § 12-8-103(5).

3.      To take the cosmetology licensure exam, students must prove they received training at an approved cosmetology school, including not less than 60 credits hours, including eight credit hours each of "hair coloring" and "haircutting," seven credit hours of "hairstyling," and other credit hours in additional technical areas, along with a minimum of six credits of training in "disinfection, cleaning, and safe work practices," and one credit training hour each in "management, ethics, interpersonal skills, and salesmanship" and "law, rules, and regulations."  *Id.* § 12-8-114(3)(a); 4 Colo. Code Regs. § 731-1:2(B)(2); *see also* Deposition of [Plaintiff] Nicole Ortega ("Ortega Dep.") at 89:14-25, 90:11-17 (docket #28-1 at 21); Affidavit of [Defendant] Dale LeMonds ("LeMonds Aff.") at ¶6 (docket #28-2 at 2).

4.      Each credit hour translates into 30 contact hours.  Ortega Dep. at 89:21-82:10; LeMonds Aff. at ¶7.  Thus, in order to be eligible to become a licensed cosmetologist in Colorado, one must receive 1,800 actual hours of instruction and attendance at a DPOS-approved cosmetology school.  Colo. Rev. Stat. § 12-8-114(3)(a); Ortega Dep. at 90:11-17.

5.      Under Colorado law, at least 75 percent of a student's credit hours "shall be obtained by clinical instruction," while the remaining 25 percent "may be obtained by theory or lecture."  4 Colo. Code Regs. § 731-1:7(C); Ortega Dep. at 95:4-10; LeMonds Aff. at ¶8.  Thus, cosmetology students

must receive at least 1,350 hours of "clinical" hands-on instruction during which they are performing cosmetology services either on mannequins or people.  LeMonds Aff. at ¶8.

6.      Following graduation, students are required to take and pass an examination administered by the State in order to become licensed, which includes written and practical components involving physically performing services such as haircutting, hairstyling, and "disinfection."  Colo. Rev. Stat. § 12-8-110; Ortega Dep. at 95:11-24; 96:13-20.

7.      AID  is a private "beauty school" approved and licensed by DPOS and formally accredited by the National Accrediting Commission of Career Arts & Sciences ("NACCAS").  Colo. Rev. Stat. § 12-8-103(5); LeMonds Aff. at ¶¶2-3; LeMonds Aff. Exs. 1, 2 (docket #28-2 at 7-11, 13-18).  The school is co-owned by Defendant Dale LeMonds and a silent partner and is a privately owned licensee of Aveda Corporation ("Aveda").  LeMonds Aff. at ¶4; LeMonds Dep. at 6:17-21.

8.      Pursuant to Colorado law, AID provides cosmetology students with a comprehensive classroom and clinical-based education, which prepares students for taking the State exam and becoming professional, licensed cosmetologists.  LeMonds Aff. at ¶4.

9.      AID's cosmetology program includes seven different phases of instruction, each lasting nine weeks for a total of 63 weeks.  *See* Deposition of Emily Burghaus[2] ("Burghaus Depo") at 16:25-17:9 (docket #28-4 at 3); Deposition of JoAnn Stevens ("Stevens Depo") at 9:3-13 (docket #28-5 at 2). AID publishes a detailed, 79-page syllabus outlining each phase, corresponding credit hours, curriculum overview on hundreds of topics, and class schedules.  Ortega Dep. at 85:1-16; 85:19-86:5; Ortega Dep. Ex. 21 ("[AID] Cosmetology Curriculum Overview") (docket #28-7 at 1-79); Ortega Dep. Ex. 22 (AID phase and course information) (docket #28-8 at 1-49).

---

[2]Plaintiff took a deposition of AID under Fed. R. Civ. P. 30(b)(6), during which five different individuals testified as to a variety of aspects of AID's business.  MSJ at 5 n.5.

10.     There are, on average, 20 cosmetology educators teaching in the cosmetology program, with one educator for every class and an average class size of 18 students.  Burghaus Dep. at 14:11-13; 15:12-20; 20:10-12.  Students typically receive instruction from a different educator for each phase, exposing them to a variety of instructors.  Burghaus Dep. at 17:3-18:4.

11.     AID begins new classes every nine weeks with as many as 48 new students; generally in a year, 90 percent of available student spots are filled.  Stevens Dep. at 54:21-55:11.

12.     Students perform classroom work, read written materials and textbooks, take written tests, and receive a wide variety of instruction, including lectures, audio/visual materials, group study, and one-on-one coaching.   Stevens Dep. at 21:12-15; Ortega Dep. Ex. 21 ("[AID] Cosmetology Curriculum Overview").

13.     To satisfy Colorado's requirements that 75 percent of cosmetology education be clinical in nature, AID operates a clinic floor where students receive hands-on training by performing cosmetology services such as haircuts during several phases of the program, which is a major component of their education.  LeMonds Aff. at ¶9; Stevens Dep. at 21:16-20; 22:1-7.  The clinic floor is structured to provide an experience similar to that of a work experience in a retail salon after they graduate; it includes 98 individual "stations" with a "salon floor chair, shampoo suite, mirrors, a cubby, and tray table."  Stevens Dep. at 50:22-51:6-10.

14.     AID provides practical training by having students perform cosmetology services on members of the public rather than mannequins; both AID and Plaintiff agree that learning on people rather than mannequins is a better practical learning tool.  Stevens Dep. at 23:10-13; Ortega Dep. at 106:21-107:1; 107:7-10.

15.     Students are able to perform these services pursuant to Colo. Rev. Stat. § 12-8-121(1)(d), which permits cosmetology school students to perform services once they have received "more than

twenty percent of the hours of instruction required," so long as they are "rendering services at [a] school under supervision of a licensee within the school setting."

16.     On average, one instructor supervises 18 students on the salon floor but can be responsible for as many as 25.  Burghaus Dep. at 18:8-20:25.  As students progress through the program, their skills improve and the need for supervision decreases.  Burghaus Dep. at 34:6-34:13; 38:11-38:14; Ortega Dep. 70:5-75:13; Ortega Dec. at 1, ¶3.  At times when instructors were busy, more senior students supervised junior students in the clinic.  Ortega Dec. at 1, ¶3.

17.     Both to comply with State law and because students are not yet knowledgeable enough to receive hands-on training on live subjects, students do not begin such training until the last three weeks of their second phase of training at AID, during which they begin performing services on the clinic floor one day a week.  Burghaus Dep. at 18:22-19:7; LeMonds Aff. at ¶11; Ortega Dep. at 39:20-40:1.  Before that, they receive practical experiences in the classroom, including using mannequins.  Stevens Dep. at 22:24-23:5.

18.     During the clinical phases of the program, students perform services on guests who pay a discounted service price to help students learn "so when they do get out in a salon, they have the ability to be successful."  Burghaus Dep. at 23:2-13.  Relatives, friends and classmates of students also have to pay full price for services.  Stevens Dep. at 25:11-26:10.

19.     AID's policy of charging customers for services "does not directly benefit the student." Stevens Dep. at 92:4-12.

20.     The salon does not have enough live guests to keep students busy, so students practice on each other or on mannequins in the salon during downtime.  Stevens Dep. at 25:11-21; 42:25-43:25.

21.     AID does not think that charging customers less would result in more customers coming to the salon because the value of the service in the minds of the guests could be devalued if there were

not a dollar amount attached to the service that makes it seem of value.  Stevens Dep. 41:13-42:2.

AID has not tested this theory by lowering prices.  *Id.*

22.     AID does not employ non-teaching cosmetologists nor does it provide to the public

professional cosmetology services performed by non-students.  LeMonds Aff. at ¶12.

23.     AID has entered into a "Program Participation Agreement" with the U.S. Department of

Education, enabling it to participate in student financial aid programs under Title IV of the Higher

Education Act of 1965.  LeMonds Aff. at ¶16; LeMonds Aff. Ex. 3 ("United States Department of

Education Federal Student Aid School Eligibility Channel: Program Participation Agreement")

(docket #28-2 at 20-36).  Based on federal law, AID must derive at least ten percent of its revenues

for each fiscal year from sources other than Title IV funds.  34 C.F.R. § 668.28(a)-(c); LeMonds

Dep. at 17:15-24.

24.     The services performed on the clinic floor generate a portion of AID's revenue that is

required not to be based on Title IV funding.  LeMonds Dep. at 19:1-5.

25.     Plaintiff is unaware of any school paying its students when they learn cosmetology by

performing services on members of the general public.  Ortega Dep. at 105:16-106:1.

26.     AID is unaware of any cosmetology school in the country that pays cosmetology students

for services performed on guests.  LeMonds Dep. at 14:25-15:2; 32:17-25.  With the exception of

this lawsuit, AID has never received any complaint from anyone about not doing so.  LeMonds Dep.

at 26:8-23.

27.     Plaintiff is unaware of any cosmetology school that trains cosmetologists by having them

perform services only on mannequins and not on persons, such as members of the public, classmates,

or friends.  Ortega Dep. at 106:21-107:1.  Plaintiff does not think she could have learned to cut hair

by working exclusively on mannequins.  Ortega Dep. at 107:7-10.

28.     AID's profit and loss statements show net income of $2,163,092 in 2012 and $1,441,641 in 2013, both after depreciation and amortization. Gibson Dep. at 41:23-42:1; Gibson Dep. Exs. 27-28 (AID profit and loss statements) (docket #35-1 at 11-16). However, the profit and loss statement "associated only with the service revenue on the clinic floor" indicates a net operating loss of nearly $450,000. Gibson Dep. at 27:17-21; 28:13-29:3; Gibson Dep. Ex. 29 (AID profit and loss statement, salon and services only) (docket #28-8 at 50).

29.     In 2012, AID's revenue derived 66.46 percent from tuition, 23.23 percent from salon sales and services, and 8.94 percent from the sale of "kits" of materials students must buy. Gibson Dep. Ex. 27 (docket #35-1 at 11-13). In 2013, AID's revenue derived 64.61 percent from tuition, 22.37 percent from salon sales and services, and 11.76 percent from the sale of kits. Gibson Dep. Ex. 28 (docket #35-1 at 14-16).

30.     The salon operation (and its attendant costs) are integral to the school's educational program, and the availability of a salon in which students log their clinical hours is one of the main reasons students pay tuition to enroll at AID. Stevens Dep. at 28:16-28:25 (docket #35-2 at 6).

31.     In the phases of the program that involve salon work, product sales are an important part of the educational program. Stevens Dep. at 8:25-12:1 (docket #35-2 at 3-4); Ortega Dep. Ex. 22 (AID phase and course information) (docket #28-8 at 1-49). AID sets goals for how much revenue should be generated from each paying customer. *Id.* A student's ability to sell product is a "big deal" and has an impact on grades. Ortega Dep. at 56:7-57:8 (docket #28-1 at 14).

32.     The AID program only teaches the Aveda line of products; if students after graduation go to work at non-Aveda salons, those salons then educate them on the new product lines. Burghaus Dep. at 40:7-16. Consequently, students sometimes need an apprenticeship or an internship after graduating from AID. *Id.* at 40:17-20.

33.      Plaintiff graduated from high school in May 2011.  Ortega Dep. at 17:9-24.  She decided to become a cosmetologist that summer and toured two schools – Paul Mitchell and AID – and decided to apply to AID.   *Id*. at 20:7-22; 21:19-25.  During her time at AID, Plaintiff continued working at her previous employer, Jump Street, an indoor trampoline center.  *Id*. at 17:9-18:7.

34.      Before enrolling, Plaintiff submitted several required application materials, including high school transcripts, a personal statement, reference letters, and a "video essay" in which she explained why she should be admitted.  Ortega Dep. at 25:3-20; Ortega Dep. Ex. 3 ("[AID] File Checklist") (docket #28-6 at 2).  Also before enrolling, Plaintiff received AID's course catalog and information concerning its licensure and job-placement rates.  Ortega Dep. at 23:10-24:21; Ortega Dep. Ex. 2 ("[AID] Pre-Enrollment Receipt") (docket #28-6 at 1).

35.      Plaintiff, admitted to AID in October 2011, signed a Student Enrollment Agreement.  Ortega Dep. at 26:8-15; Ortega Dep. Ex. 4 ("[AID] Student Enrollment Agreement") (docket #28-6 at 3-7).  The agreement advised her specifically: "The school does not guarantee job placement.  We provide assistance through Career Fairs, resume and self-promotion techniques and access to the Aveda Pure Pro marketing tools."  Ortega Dep. Ex. 4 at § 14.

36.      When Plaintiff toured AID before enrolling, she was told that enrolling there was the only way to get a job at an Aveda salon after graduation, and that she would have "an awesome job" and "make a lot of money."  Ortega Dep. at 20:14-21:5.

37.      Plaintiff financed her education, which at that time cost a total of $22,332, by applying for and receiving roughly $11,000 in federal Pell Grants, which she described as "money from the federal government that you don't have to pay back."  Ortega Dep. at 28:17-29:5; 60:24-61:4; *see also* LeMonds Aff. at ¶17; LeMonds Aff. Ex. 4 ("[AID] 2012-2013 Financial Aid Award and Acceptance Contract: 2nd Academic Year") (docket #28-2 at 38-39).  She also received roughly

$20,000 in federal government subsidized and unsubsidized student loans, but she chose to use $10,950 of the loans for her living expenses.  Ortega Dep. at 61:15-23; Ortega Dep. Ex. 5 ("[AID] 2011-2012 Financial Aid Award and Acceptance Contract 1st Academic Year") (docket #28-6 at 8); LeMonds Aff. Ex. 2 ("National Accrediting Commission of Career Arts & Sciences" letters to AID) (docket #28-2 at 13-18).

38.     Plaintiff did not believe she would be compensated for any time she spent at AID.  Ortega Dep. at 29:14-30:1.  No one at AID ever told her she would be compensated for any time spent there, including on its clinic floor, and nothing in any of the documents she received from AID stated that she would be paid.  *Id.*

39.     Plaintiff had no expectation at any time during her attendance that AID would hire her upon graduation.  *Id.* at 106:14-20.

40.     As part of enrollment, AID required Plaintiff to pay fees to AID for a "starting kit" that included an iPad containing course books (which she kept after graduation) and other materials such as "shears and blow dryers."  *Id.* at 30:2-31:9, 31:18-24.

41.     Ortega did well throughout the 13 months of her cosmetology program and received "satisfactory progress reports" with cumulative academic grades at four intervals.  *Id.* at 32:19-24; 33:8-14; Ortega Dep. Ex. 7 ("[AID] Satisfactory Progress Reports") (docket #28-6 at 9-12).

42.     The first nine-week phase of the program, entitled "Grounding," consisted of classroom work on the basics of cosmetology and was taught by her favorite teacher.  Ortega Dep. at 34:4-23.

43.     The first phase involved more than 50 instructional tasks, including, for example, shampooing a mannequin's hair.  Ortega Dep. at 35:11-17; 36:10-37:21; Ortega Dep. Ex. 8 ("[AID] Mid-Phase Evaluations") (docket #28-6 at 13-14).

44.     The second phase, entitled "Nurturing," focused on learning how to cut hair and perform

manicures and pedicures; Plaintiff practiced cutting hair on mannequins as she was not permitted to do so on live subjects until close to the end of the second phase.  Ortega Dep. at 38:19-40:1; Ortega Dep. Ex. 9 ("[AID] Mid-Phase Evaluations") (docket #28-6 at 15-16).

45.     Plaintiff acknowledged at the end of the second phase that the experience of learning to cut hair and actually cutting hair was "scary."  Ortega Dep. at 41:24-42:4; 42:13-43:8; Ortega Dep. Ex. 10 ("[AID] Mid-Phase Evaluations") (docket #28-6 at 17-18).  Prior to being able to train on the clinic floor, AID required Plaintiff to train on live models in the classroom; Plaintiff brought relatives to serve as models so she could practice.  Ortega Dep. at 43:20-44:3.

46.     Plaintiff continued progressing through the program and eventually began training on members of the public on the clinic floor.  *Id*. at 45:1-46:9 ; Ortega Dep. Ex. 11 ("[AID] Mid-Phase Evaluations") (docket #28-6 at 19-20).  Plaintiff said that while performing these services, "somebody ha[d] to hold my hand and show me how to do the cut," and she commended in particular the teacher of her fourth phase for doing so.  Ortega Dep. at 45:1-46:9 (docket #28-1 at 11-12).  By the conclusion of the fourth phase, she felt more comfortable coloring hair but was still less comfortable with cutting hair.  *Id*.

47.     While on the clinic floor, Plaintiff performed cosmetology services on members of the public and on classmates.  *Id*. at 66:4-68:2.

48.     Guests were assigned to students on the clinic floor that who, at the time, had the most experience (*e.g.*, the highest numerical phase of the program).  Burghaus Dep. at 32:2-25; Stevens Dep. at 45:3-9.

49.     Every student on the clinic floor had to perform at least one service before any other student could perform a second service.  Stevens Dep. at 45:10-18; Burghaus Dep. at 34:21-35:1.

50.     Students did not perform any reception duties.  Stevens Dep. at 24:25-25:2.  Students also

did not check in guests as AID employed paid retail staff to do so.  Burghaus Dep. at 24:8-11.

51.     When a guest was checked in at AID, he or she was given a "traveler," a document containing a "chart of checks that need to be done" and specific "educator checkpoints."  *Id*. at 24:12-16; 27:17-28:8; Ortega Dep. Ex. 32 (sample of "traveler") (docket #28-8 at 53).

52.     AID required Plaintiff to become familiar with cleaning and disinfection requirements imposed by the State of Colorado.  Ortega Dep. at 90:11-17; Burghaus Dep. at 49:6-13; LeMonds Aff. at ¶13; 4 Colo. Code Regs. § 731-1:7 (requiring six credit hours, *e.g.*, 180 contact hours, of training in disinfection, cleaning, and safe work practices).

53.     At the end of each shift at the school's salon, Plaintiff was required to spend one hour cleaning her immediate workspace and could also be required to clean classrooms, retail areas, hallways, bathrooms, and break rooms.  Ortega Dep. at 91:1-95:2.

54.     The cleaning taught students about sanitation and disinfection and was an important part of their education at AID.  Stevens Dep. at 27:12-28:25.  Cleaning of bathrooms was limited to wiping down sinks and mirrors.  *Id.* at 28:7-15.  Sanitation and disinfection of the cosmetologist's workspace and equipment is part of the licensing process; additional cleaning knowledge is not.  *See* 4 Colo. Code Regs. § 731-1:2.  However, students benefitted from the cleaning in general because "any area of the building where students and guests may be, we want to ensure that it's appropriately sanitized" to ensure the safety of students and guests.  Stevens Dep. at 27:8-18.  AID views performing services on humans, mannequins, doing book work in the classroom, sanitizing equipment, cleaning classrooms, and handling other cleaning duties all as important parts of students' education.  *Id*. at 28:16-25.  Plaintiff thought some of the cleaning tasks involved "no learning whatsoever."  Ortega Dec. at 4, ¶10.  For example, in her deposition, Plaintiff stated: "I don't understand why you'd have to learn how to vacuum.  Like everybody knows how to vacuum."

Ortega Dep. 91:12-14.

55.     AID has a paid, third-party janitorial staff that cleans the entire school daily.  Stevens Dep. at 29:18-30:10; 31:23-32:10; LeMonds Aff. at ¶15.  The cleaning crew cleans the bathrooms. Burghaus Dep. at 50:13-16.

56.     Plaintiff successfully completed her fifth and sixth phases and participated in salon tours, which included visiting Aveda and non-Aveda commercial retail salons.  Ortega Dep. at 48:5-16; 50:3-51:4; Ortega Dep. Ex. 12-13 ("[AID] Mid-Phase Evaluations") (docket #28-6 at 21-25).

57.     Plaintiff's seventh phase, entitled "Wisdom," focused on preparing her for the State exam. Ortega Dep. at 52:20-53:8 (docket #28-1 at 13); Ortega Dep. Ex. 14 ("[AID] Mid-Phase Evaluations") (docket #28-6 at 26-27).  At the time, Plaintiff said she needed to do more work on explaining why a guest needed a particular product, which is part of being a cosmetologist and something one has to learn.  Ortega Dep. at 54:5-11; 54:22-55:10.

58.     Plaintiff said that during the last phase of the program, her educator was required to provide additional assistance and physically adjust haircuts Plaintiff performed on guests, stating that "if it didn't look good, [the educator] would do it."  *Id.* at 74:17-25.

59.     It took Plaintiff less time to perform cosmetology services on a person at the end of the program than it did in the beginning.  Ortega Dep. at 44:4-9.  However, Plaintiff acknowledged that during the seventh phase, she needed to learn "how to cut my time on [the] floor" and become more efficient and faster at cutting hair.  *Id.* at 55:11-24; Ortega Dep. Ex. 14.

60.     During Plaintiff's last phase, her educator "spent one-on-one time with her on the salon floor because that's where she needed the most assistance, especially with short-hair cutting, and . . . how to effectively educate guests about products."  Burghaus Dep. at 55:6-11.

61.     As part of Plaintiff's seventh phase, AID hosted a job fair.  Ortega Dep. at 57:13-25.  There,

Plaintiff met someone from La Tierra Salon & Day Spa who gave Plaintiff a business card. *Id.* at

57:13-25. Plaintiff subsequently met with that person and obtained a job following graduation. *Id.*

62.     Following Plaintiff's completion of the seventh phase and, therefore, her fulfillment of the

requisite 60 credit hours (1,800 actual hours) under Colorado law, Plaintiff graduated from AID in

February 2013. *Id.* at 81:15-82:10; Ortega Dep. Ex. 17 ("[AID] Record of Completion") (docket

#28-6 at 28).

63.     Plaintiff graduated with "High Academic Honors" and received a diploma from AID with

a degree in cosmetology, which she needed to sit for the licensure exam. *Id.* at 83:3-19; Ortega Dep.

Ex. 18 ([AID] diploma) (docket #28-6 at 29). Plaintiff also received her academic transcripts that

indicated her grades and hours spent in the clinic, also required for licensure. Ortega Dep. at 83:3-

19.

64.     When Plaintiff graduated, AID provided her with personal contact information of guests for

whom she had performed services and thus, a list of customers who might want to follow her once

she became licensed and employed. *Id.* at 77:19-78:14. Plaintiff is unaware of any retail salon that

gives away customer contact information. *Id.*

65.     Following graduation, Plaintiff took the State licensing exam and passed on her first attempt.

Ortega Dep. at 95:25-96:3. After she became licensed, she took a position as an intern at La Tierra,

an "Aveda-concept salon" that carries Aveda's product line but is not an Aveda salon or affiliated

in any financial way with AID. *Id.* at 12:21-24; 13:12-20; LeMonds Aff. at ¶18.

66.     Plaintiff started as an intern to learn more: "I felt like I didn't get enough schooling, so we

went there – they like bettered your knowledge, and they taught you to make sure you had all the

haircuts down, so I didn't have to start at Great Clips or something." Ortega Dep. at 14:18-25.

67.     La Tierra paid Plaintiff minimum wage for the first five months; she then made $10 an hour,

but the salon ultimately fired her because she and the owner "didn't like each other." *Id.* at 14:25-15:6.

68.     Plaintiff then applied to, and was hired by, Floyd's Barbershop as a full-time employee, where she continued to work at the time of her deposition.  Ortega Dep. at 7:3-11; 9:3-6; 10:9-10.

69.     Beyond applying for her job at Floyd's Barbershop after being terminated by La Tierra, Plaintiff has not applied for a cosmetology job anywhere else.  *Id.* at 16:21-17:8.  She said at her deposition that she was satisfied with her compensation and had no plans to look for a higher-paying job.  *Id.*

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility to provide the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."  *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

The nonmoving party has the burden of showing there are issues of material fact to be

determined.  *Celotex*, 477 U.S. at 322.  That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation omitted); *see also Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002).  These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324).  "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005).  "The court views the record and draws all inferences in the light most favorable to the nonmoving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

Whether Plaintiff was an "employee" of AID is a question of law.  *See Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1441 (10th Cir. 1998).  Summary judgment is appropriate if Defendants demonstrate there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law.  *Celotex,* 477 U.S. at 322-23.  The Court first discusses issues regarding its fact finding in this case, followed by an analysis of whether Plaintiff was an "employee" under the FLSA and, finally, whether Plaintiff has claims based on Colorado law.

## I.      Findings of Fact

Plaintiff agreed with nearly the entirety of Defendants' statements of undisputed fact.  *See* Response at 3-7.  Plaintiff then failed to produce a statement of disputed material facts, instead providing her own list of allegedly undisputed facts (*see id.* at 7), which the Court has incorporated into its findings when supported by the record.  When facts were in conflict between parties, the Court included facts viewed in the light most favorable to Plaintiff unless record evidence disputed Plaintiff's assertions (*e.g.*, when Plaintiff mischaracterized the depositions of others or of herself).  However, Plaintiff also provided with her Response a "Declaration of [Plaintiff] Nicole Ortega," created after her deposition and called a "sham affidavit" by Defendants (*see* Reply, docket #36 at 3 n.1).  The Court has serious reservations about the Declaration for the following reasons.

"An affidavit or declaration . . . must be made on personal knowledge, shall set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  The Court is not to consider conclusory and self-serving affidavits.  *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002); *see also Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995).  Plaintiff's Declaration here contains unsupported, conclusory, self-serving statements.  *See, e.g.*, Ortega Dec., docket #35-5 at 3, ¶8 ("If I had been able to perform services on volunteer live models who were not required to pay fees to Aveda[,] I would have spent my time in the Aveda salon learning to perform the services I needed to practice to be successful after I graduated from Aveda instead of sitting around waiting for paying customers."); ¶9 ("It would have been very easy for Aveda to recruit a limitless supply of live models eager to receive services from students for free, such services being limited to the ones students needed experience performing and not what Aveda could successfully charge customers for.").  Other portions of the Declaration appear in conflict with Plaintiff's sworn

deposition testimony.  *Compare* Ortega Dec. at 3 ("[P]articularly in the last two phases of the program, instructor supervision is virtually non-existent"); *with* Ortega Dep. at 9 (indicating that even in the last phase of her training at AID, she needed help adjusting haircuts: "If it didn't look good, [the instructor] would do it.")  The Declaration also attempts to use inadmissible hearsay.  *See, e.g.,* Ortega Dec. at 3, ¶6 ("[T]he salon owner [at a post-graduation job] felt I was not adequately prepared.").

The Court also perceives that the Declaration's language appears to be attorney-initiated versus that used by Plaintiff in her deposition, making the Declaration additionally suspicious.  *See, e.g.*, Ortega Dec. at 2-6 ("[T]hat procedure is ignored in whole or in part;" "[t]hey become adept at the services," "I became proficient in the services"); *but see* Ortega Dep. at 4 ("Me and the owner didn't like each other"), at 8 ("Like with short haircuts, I wasn't very good at [them] and I'd be like: 'I don't know what I'm doing,' . . . Or they'd be: 'I don't know what you're doing either.'").[3]

The Court questions the Declaration for the reasons described above  yet concludes after a review of the entirety of the other materials that there are no disputed material facts in this case, even considering the alleged facts in the Declaration.

## II.     FLSA

A.     Overall Legal Framework

"The FLSA itself provides little guidance in distinguishing between trainees and employees." *Reich v. Parker Fire Prot. Dist.*, 992 F.2d 1023, 1025 (10th Cir. 1993).  Under the FLSA, an employee is defined as "an individual employed by an employer." 29 U.S.C. § 203(e)(1). "Employ"

---

[3]Under 28 U.S.C. § 1746, a declarant must sign the declaration.  Here, the signature on the Declaration does not appear to be signed by Plaintiff as it does not resemble her signature provided throughout the record on educational documents.  *Compare* Ortega Dec. at 5; *with* docket #28-6 at 1, 2, 7, 9, 10, 11, 12, 13, 15, 17, 19, 21, 24, 26 (all containing signatures that appear consistent with one another but inconsistent with that on the Declaration).

means "to suffer or permit to work." 29 U.S.C. § 203(g). The FLSA, however, does not address

compensation for students and trainees, leading parties to court to define its reach, including to the

Supreme Court in the landmark decision *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947).

There, "prospective yard brakemen" who participated in training that was "a necessary requisite to

entrusting them with the important work brakemen must do," claimed they were "employees" of the

private railroad company that trained them. *Id.* at 149-50. The trainees were first to be taught, then

to observe, and then "gradually permitted to do actual work under close scrutiny." *Id.* at 149. The

Supreme Court explained:

> The [Fair Labor Standards] Act's purpose as to wages was to insure that every
> person whose employment contemplated compensation should not be compelled to
> sell his services for less than the prescribed minimum wage. The definitions of
> "employ" and "employee" are broad enough to accomplish this. But, broad as they
> are, they cannot be interpreted so as to make a person whose work serves only his
> own interest an employee of another person who gives him aid and instruction. Had
> these trainees taken courses in railroading in a public or private vocational school,
> wholly disassociated from the railroad, it could not reasonably be suggested that they
> were employees of the school within the meaning of the Act. Nor could they, in that
> situation, have been considered as employees of the railroad merely because the
> school's graduates would constitute a labor pool from which the railroad could later
> draw its employees. The [FLSA] was not intended to penalize railroads for
> providing, free of charge, the same kind of instruction at a place and in a manner
> which would most greatly benefit the trainees. . . . [W]e hold that they are not
> employees within the Act's meaning.

*Id.* at 152-53 (internal citations omitted).

To provide a workable framework post *Portland Terminal*, the U.S. Department of Labor's

Wage and Hour Division drew on that case to develop a six-factor test to determine whether trainees

are employees within the FLSA. *Reich*, 992 F.2d at 1025. The factors are:

1.   The training, even though it includes actual operation of the facilities of the
     employer, is similar to that which would be given in a vocational school;
2.   The training is for the benefit of the trainee;
3.   The trainees do not displace regular employees, but work under close
     supervision;
4.   The employer that provides the training derives no immediate advantage

5.     from the activities of the trainees and on occasion his operations may actually be impeded;

5.     The trainees are not necessarily entitled to a job at the completion of the training period;

6.     The employer and the trainees understand that the trainees are not entitled to wages for the time spent in training.

*Id.* at 1026 (citing Wage & Hour Manual (BNA) 91:416 (1975)). The Tenth Circuit in *Reich* explained that no one factor is dispositive, rather the test is based on the totality of the circumstances. *Reich*, 992 F.2d at 1027 (citing *Dole v. Snell*, 875 F.2d 802, 805 (10th Cir. 1989)); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). "[I]n determining whether an individual is an 'employee' within the meaning of the FLSA, we must look to the economic realities of the relationship." *Reich*, 992 F.2d at 1027 (quoting *Doty v. Elias*, 733 F.2d 720, 722 (10th Cir. 1984)). There is, however, no *per se* FLSA exclusion for student workers. *Marshall v. Regis Educ. Corp.*, 666 F.2d 1324, 1327 (10th Cir. 1981).

In *Marshall*, the Court applied the totality of the circumstances test, including the above factors in examining whether students serving as resident-hall assistants ("RAs") in dormitories at Regis College were employees within the FLSA. *Id.* at 1325. The RAs had an "employment agreement" and helped to maintain discipline and encourage student involvement, generally working about 20 hours each per week. *Id.* at 1326. In exchange, the RAs received a reduced rate on their rooms, the use of a free telephone, and a $1,000 credit on their tuition. *Id.* The U.S. Secretary of Labor brought suit under the FLSA for wages. *Id.* But the Tenth Circuit found the RAs were not employees:

We believe the Government's perspective to be so limited as to ignore not only the broad educational purpose of this private liberal arts college, but also the expressed educational objectives of the student resident assistant program. The Government's attempt to extend the scope of the FLSA to include full-time student [RAs] participating in this program goes beyond the statutory mandate and simply does not take into account the "totality of the circumstances." . . . The mere fact that the College may have derived some economic value from the RA program does not

> override the educational benefits of the program and is not dispositive of the
> "employee" issue. . . . The query is whether the [RAs] at Regis are more like sales
> clerks or more like students in other campus programs receiving financial aid.

*Id*. at 1327-28 (internal citations omitted). Further, the Tenth Circuit agreed with and quoted the

reasoning of the District Court's conclusion:

> The [RAs] involved in this lawsuit did not come to Regis to take jobs. They enrolled
> as full-time students seeking growth and development from adolescents into mature
> human beings and desiring to earn the recognition of an academic degree. . . .
> [C]onsidering the totality of the circumstances, the [RAs] were not "employees" of
> [Regis] within the meaning of the FLSA.

*Id*. at 1328.

Notably, other federal courts have recently granted summary judgment in cases regarding

cosmetology students asserting FLSA claims similar to that brought by Plaintiff. *See Atkins v. Capri*

*Training Ctr.*, No. 2:13-cv-06820, 2014 WL 4930906 (D.N.J. Oct. 1, 2014); *Jochim v. Jean*

*Madeline Educ. Ctr. of Cosmetology*, No. CIV-A-13-6564, 2015 WL 1565827 (E.D. Pa. Apr. 8,

2015).

In *Jochim*, brought under Pennsylvania's statutory framework similar to Colorado's

regarding licensure of cosmetologists, the federal court looked at the totality of the circumstances

to determine the economic realities of the relationship between the cosmetology student and the

school she sued. *Jochim*, 2015 WL 1565827 at 6. That court considered facts strikingly similar to

the case at hand, including arguments focusing on lack of supervision of the students and allegations

that the school's profits from the school were an integral part of its business. *Id*. at 7. The *Jochim*

court's thoughtful analysis in granting summary judgment is instructive:

> [Plaintiff] alleges that [defendant's] profits from its clinic are an integral part of its
> business, while [defendant] asserts that its main business is the [s]chool itself and
> that the clinic does not generate revenue. But even if we accept [plaintiff's]
> assertion, . . . the entirety of the economic realities weighs against finding an
> employment relationship. [Defendant] is a cosmetology school that offers, as part
> of its basic cosmetology curriculum, a realistic clinic in which students can practice

21

> treatments and hone customer service skills, retail skills, and sanitary practices as Pennsylvania law requires. . . . [Defendant's] alleged profit from its clinical program does not change our analysis under the FLSA.  Even assuming [] the clinic is profitable, that factor alone does not transform the economic reality of the relationship between [defendant] and [plaintiff] into one qualifying as an employee/employer under the FLSA. . . . The economic reality of the relationship was that [plaintiff] paid the [s]chool tuition in exchange for an education in cosmetology, and a significant part of her education included working in [defendant's] clinic as a student.

*Id*. at 7-9 (specific references to facts omitted).

Similarly, the *Atkins* court in New Jersey, again under a similar statutory framework as Colorado's for licensure of cosmetologists,  also granted summary judgment for a cosmetology school in an FLSA case – finding that the plaintiff was a student, not an employee, and thus not covered by the FLSA.  *Atkins*, 2014 WL 4930906 at 10.  The *Atkins* court rejected the same arguments being proffered here, including concerns about the school's profits and the students' janitorial duties, providing the following helpful analysis:

> [D]efendants argue there was no profit made on the [c]linic.  However, even assuming that there was a profit, given the circumstances and the licensing requirements, the primary benefit of student training in the [c]linic is to the student, here [p]laintiff.  These students are economically dependent on the school, did not expect a job with the school or degree of permanence, and had no expectation of being paid.  However, the students require hands on supervised training for licensing in their field. . . . [T]he existence of profitability, in and of itself, would not create an employer/employee relationship.  Rather, the economic realities test focuses on dependency, the expectation of continued work, and a common sense view of the underlying facts and circumstances. . . . Overall, this [c]ourt finds [plaintiff's] argument unpersuasive.  The purpose of the [c]linic is to mimic a real beauty salon.  The statutorily-mandated clinical program allows students to train under the instruction of a professional in a safe environment while affording students the chance to gain the experience and skills needed to succeed after graduation.  The duties that [plaintiff] was required to perform at the [c]linic are the same sorts of duties she may have to perform in a regular salon. . . . Thus, these "janitorial, clerical [and] logistical functions" may actually further the educational goals of the clinical program []."

*Id*. at 8-10 (extraneous facts omitted).  The Court is persuaded that these decisions represent good law.

Plaintiff largely relies on her argument that the main factor to be considered is that of the "immediate advantage" to the employer of "free student labor."   Response at 21-22.   Plaintiff heavily cites *Houle v. Duvall*, 111 N.H. 333, 334 (1971), a New Hampshire case that held hairdressing students who provided services to paying customers gave pecuniary gain to the school, so the students were to be considered employees.   However, the case did not involve a review of the FLSA, rather the court analyzed a labor commissioner's power regarding issuing a wage order.   *Id.* at 336.   Additionally, *Houle* pre-dated the 1975 promulgation of the U.S. Department of Labor's six-factor test, which has since been adopted by the Tenth Circuit.   *See Reich*, 992 F.2d at 1026.

In fact, federal courts have routinely rejected the approach of focusing on the "immediate advantage" factor.   *See, e.g.*, *Marshall*, 666 F.2d at 1327 (RAs were not FLSA employees and the "mere fact that the [c]ollege may have derived some economic value from the RA program does not override the educational benefit of the program and is not dispositive of the 'employee' issue," discussed *supra*); *Solis v. Laurelbrook*, 642 F.3d 518, 527-31 (6th Cir. 2011) (even where students performed services for which their school billed and received revenues from the public, the students were still deemed to be the primary beneficiaries of their activities as they received tangible and intangible benefits from the hands-on training); *Blair v. Wills*, 420 F.3d 823, 829 (8th Cir. 2005) ("having students perform chores helped defray certain costs that the [schools] would have incurred had they hired employees to perform those tasks").   While Plaintiff asserts that the "linchpin of the decisions is the relative economic benefit to the employer" (Response at 13), the cases she cites fail to establish that proposition.   *See, e.g., Glatt v. Fox Searchlight Pictures Inc.*, 293 F.R.D. 516, 532 (S.D.N.Y. 2013) ("No single factor is controlling; the test 'requires consideration of all the circumstances.'"); *Marshall v. Baptist Hosp., Inc.*, 473 F. Supp. 465, 469 n.5 (M.D. Tenn. 1979) ("While language from [] *Portland Terminal Co.* would, if taken to extreme, indicate an employment

23

relationship where the alleged employer derives any benefit at all, this would not, of course, comport with the flexibility of the 'economic realities' test.") Other than *Houle*, distinguished above, the Court could find no cases to the contrary.

B.      Six-Factor Analysis

With the legal landscape framed, the Court now considers the six factors in light of the totality of the circumstances to determine the economic realities of the relationship between Plaintiff and AID.

1.      <u>The training is similar to that which would be given in a vocational school.</u>

It is undisputed that AID is, in fact, a vocational school. *See* Response at 29 ("Plaintiff acknowledges that Defendants operate a vocational school."). The Court agrees with Defendants' characterization that "the training [Plaintiff] received is not merely '*similar*' to training provided in educational setting: it *is* the training one receives in an educational institution."  MSJ at 25-26.

AID is a private beauty school approved and licensed by the State of Colorado and formally accredited.  Plaintiff applied to AID using materials typically required to apply to a school: a high school transcript, a personal statement, references and the like.  AID provides comprehensive classroom and clinical-based education, which prepares students for the licensure test.  The program includes several specific phases of instruction, all tailored to teaching students, as detailed in a 79-page syllabus.  As the State requires 75 percent of cosmetology education be clinical in nature, AID operates a clinic where students receive hands-on training.  Plaintiff went through the entirety of the program, received grades and periodic progress reports, graduated with high honors, and used those records to apply for and then take and pass the State of Colorado licensure exam on the first attempt.

Also relevant here is that AID has entered into an agreement with the U.S. Department of Education enabling it to participate in student financial aid programs; Plaintiff received federal

financial aid, including Pell Grants – in the amount of more than $20,000 – to attend AID. This makes her a student, not an employee, similar to the RAs in *Marshall* who "were not 'employees' within the meaning of the [FLSA], but student recipients of financial aid." *Marshall*, 666 F.2d at 1328.

As there are no disputed material facts regarding this issue, the Court concludes that AID is a vocational school.

2.     The training is for the benefit of the trainee.

The record establishes that AID's training was for the benefit of Plaintiff. She could not have become licensed in Colorado without completing the requirements through a school such as AID. In fact, it would have been illegal for her to practice as a cosmetologist without first possessing the requisite amount of training, which must include 75 percent clinical instruction. The other 25 percent of the training had to involve classroom work and a variety of instruction that moved students along in the program toward becoming cosmetologists.

As in *Reich*, in which the Tenth Circuit noted "[t]here is no question but that, in acquiring skills transferable within the industry" fire fighter trainees found not to be employees "benefitted from their training," Plaintiff benefitted by learning what she needed to know to become a cosmetologist. *See Reich*, 992 F.2d at 1028. Plaintiff concedes that she benefitted from her work on live models in the salon and was "scared" to cut hair on a live person, having started on mannequins. Plaintiff also admits that "somebody ha[d] to hold my hand and show me how to do the cut," and even during her last phase of the program before graduation, she still required supervision from her educator. Plaintiff said, for example, that if the cut did not look good, the educator would fix it for her. At the end of the program, it took Plaintiff less time to perform cosmetology services than it did at the beginning, but she still needed help with efficiency, with

short-hair cutting, and with educating guests about products.

Plaintiff argues that her performance of "janitorial" duties were for AID's benefit and not her own. Response at 7. However, cosmetology students must prove to the licensing board that they received at least 180 hours of training in cleaning and disinfection, which is why AID includes that training in its program. Furthermore, AID has a paid janitorial service to clean toilets and areas irrelevant to the students' training, and AID has paid staff to answer phones and greet guests. The bathroom cleaning is limited to wiping the mirrors and sinks, and the remainder of the cleaning is reasonably part of learning skills relevant to working in a salon. As with the cosmetology student in *Atkins*, the janitorial functions benefitted Plaintiff.

Similarly, Plaintiff argues that the heavy focus on sales of Aveda products to guests of the clinic were a benefit to AID but not to her. Response at 26. Selling products is an important part of work in a salon and knowing the Aveda product line helps students if they are employed at Aveda salons. Plaintiff's first job after graduation was at an Aveda salon. Thus, knowledge of the Aveda line would have been a benefit to Plaintiff in her training and the profits to AID in and of themselves do not alter that analysis. Plaintiff's lack of knowledge of other product lines and whether that harmed her ability to succeed at a later job is immaterial to the analysis.

As there are no disputed material facts regarding this issue, the Court concludes that Plaintiff benefitted from the training at AID.

3.   <u>The trainees do not displace regular employees, but work under close supervision.</u>

It is undisputed that there are no employees performing cosmetology services at AID who are not educators of the students. The school is not a commercial retail salon, so AID does not employ non-teaching cosmetologists. Plaintiff argues that "the actual amount of supervision is a disputed fact issue" (*see* Response at 28), yet Plaintiff's own deposition testimony, which was not

corrected, indicated even she needed supervision through the final phase of her time at AID.

Even considering additional facts in Plaintiff's Declaration that indicate "instructor supervision is virtually non-existent" and "senior students often supervised and assisted junior students because the instructors were too busy" (Ortega Dec. at ¶3), does not change the analysis. The record shows that students are supervised extensively at the beginning of the program; as students progress, their need for supervision decreases as they moved along toward graduation and prepared to take jobs at salons.

Notably, the Tenth Circuit in *Reich* stated that even if trainees took on some supervisory roles, the question is whether trainees assumed the duties of employees (*see Reich*, 992 F.2d at 1028), a fact that Plaintiff attested was not the case at AID. Further, Colorado law prohibits students from performing cosmetology services without a license unless they are "rendering services at [a] school under supervision of a licensee within the school setting." Colo. Rev. Stat. § 12-8-121(d).

The Court concludes that there are no disputed material facts regarding this issue; AID students do not displace regular employees but work under close supervision.

4.    <u>The employer that provides the training derives no immediate advantage from the activities of the trainee and on occasion his operations may actually be impeded.</u>

Plaintiff focuses primarily on this factor, as noted *supra*, arguing that *Portland Terminal* and its progeny, including *Houle* and *Reich*, stand for the proposition that "the determinative issue in the analysis is the generation of a substantial economic benefit from free or subminimum (*sic*) wage labor, i.e., the exploitation of labor the FLSA is designed to prevent." Response at 17. Plaintiff further argues: "[T]his is particularly the case where, as here, Defendants sacrifice the quality of the education they offer students to maximize revenues. . . . It is not the 'performing of clinical work' (whether required or not by the State of Colorado) that gives rise to this case. As in *Houle*, it is Defendants' sale of that 'work' to the public for pecuniary gain that violates the FLSA and Colorado

law." *Id*. at 1-2.  Plaintiff points to profit and loss statements of AID as a whole to argue that AID is making "millions of dollars in salon revenue" on the backs of "free student labor."  Response at 28.

However, the record shows that AID operates the salon at a loss of nearly a half-million dollars a year, a fact Plaintiff ignores in her recitation of the facts but attempts to counter in argument by saying (in somewhat circular fashion):

> The Aveda school's salon is an integral part of the school.  Students would not enroll in the Aveda school, and pay tuition to attend, if the school had no such facility. Defendants' assertion that the salon operated a loss ignores this fundamental operational reality.  That "loss" is phantasmal and arrived at by attributing a large range of expenses (which may or may not be properly allocable) to the salon and limiting the salon's revenue to only the amounts received from salon service and product sales.  Yet such a financial analysis ignores that the salon functions as an absolutely necessary facility of the school.  Students spend 75 percent of their school hours in the salon, meaning that 75 percent of their tuition payments go to purchase that "salon time" as part of their education.  Since the salon is integral to the educational program, and all of its costs are integral to operating the program as a whole, the salon's profitability can only be determined by examining the profitability of the school and salon as a single entity, which they are.

Response at 23-24.

The Court notes that the separate, salon-only profit and loss statement came into the record through Plaintiff's corporate deposition of AID, showing the salon operating at a loss of a half-million dollars, yet Plaintiff failed to provide that exhibit to the Court or provide a factual basis for the above-quoted theories.  Additionally, the full AID profit and loss statements show salon sales and services totaled approximately one quarter of the total revenue.  Thus, the Court is not persuaded by Plaintiff's arguments that the salon brought in millions of dollars.  The Court also notes that even if the school had made millions, including from tuition and the salon as Plaintiff asserts, it would still be insufficient under the facts at hand to defeat summary judgment based on the totality of the circumstances that indicate Plaintiff was a student and not an employee.

Plaintiff then argues that the decision to charge guests under AID's fee structure is of no benefit to the students but merely benefits the school. Response at 24-25. Plaintiff asserts that Defendant "could not only operate the school and fully educate students without ever charging a penny to customers, they would have provided a far better education to those students (by having a constant flow of live models) if they had done so instead of maximizing their salon revenue from the students' unpaid labor." *Id.* at 25. While charging the guests does not directly benefit students, AID indicated that it charges guests to cover costs and to ensure that the guests attach a level of reasonable value to the services provided. This fact was never countered by Plaintiff, who merely provided conclusory statements that the school would be filled with an endless supply of people seeking cosmetology services if the school provided the services for free. Response at 24-25. Additionally, the funds that derive from guest services provide an important portion of the school's revenue as AID is required to generate funds separate from those received from the government.

On the whole, the main beneficiaries of the clinic are the trainees, ensuring students such as Plaintiff complete the necessary hours of hands-on training to be eligible to sit for and pass the licensing exam. As with federal courts that handled similar cosmetology-student claims in *Jochim* and *Atkins*, the Court concludes, even presuming the higher level of profits and deficiencies in the education from having fewer people on whom to practice, there are no disputed material facts indicating AID derives "immediate advantage" from the trainees.

5. <u>The trainees are not necessarily entitled to a job at the completion of the training period.</u>

Plaintiff said she did not expect to be hired at AID at the completion of her training. Plaintiff signed a Student Enrollment Agreement that specifically noted: "The school does not guarantee job placement. We provide assistance through Career Fairs, resume and self-promotion techniques and access to the Aveda Pure Pro marketing tools." Plaintiff was told during her tour of the school as

a prospective student that going to AID was the only way to get a job at an Aveda salon; in fact, she did secure a job through an introduction at an AID job fair to a salon called La Tierra, where she worked after graduation.  As there are no material disputed facts regarding this issue, the Court concludes that Plaintiff did not expect and was not entitled to a job at the completion of the training period.

6.    The employer and the trainees understand that the trainees are not entitled to wages for the time spent in training.

This, too, is undisputed: Plaintiff stated at her deposition that she did not believe she would be compensated for any time she spent at AID.  No one at AID ever told her she would be compensated for any time spent there, including on its clinic floor, and nothing in any of the documents she received from AID stated she would be paid.  She and AID are also unaware of any cosmetology school paying students for services done on guests.  Plaintiff financed her education in order to go to school.  Therefore, as there are no disputed material facts regarding this issue, the Court concludes Plaintiff and AID understood Plaintiff would not be entitled to wages for the time she spent in training.

Overall, having considered the six factors and the totality of the circumstances per *Reich* of the "entirety of the economic realities," the undisputed material facts establish that Plaintiff went to AID as a student to meet the licensing requirements of Colorado, attended the school as a student, graduated as a student, and was never an employee; thus,  Plaintiff's FLSA claim cannot survive as a matter of law.

### III.    State Law Claims

Plaintiff also alleges that AID violated the Colorado Wage Claim Act, Colo. Rev. Stat. § 8-4-101, *et seq*., Article XVIII, § 15 of the Colorado Constitution, and Colorado's Minimum Wage Order.  *See* Complaint at  1, 9.  Defendants contend that Colorado law bars Plaintiff's claim that she

was an employee while enrolled at AID.  MSJ at 16.  Plaintiff responds that she functionally served

as an "employee" while at AID and under Colorado law should have been compensated.  Response

at 31.   It is undisputed that Colorado has a statutory and regulatory scheme for cosmetologists that

requires students to train clinically before becoming licensed.  Colo. Rev. Stat. § 12-8-121(1)(d).

Despite this, Plaintiff argues that the Colorado Minimum Wage Act, Colo. Rev. Stat. § 8-6-101, *et*

*seq*., as implemented by the Colorado Minimum Wage Order, requires employers to pay a minimum

wage to their employees.

The Colorado Supreme Court has held that cosmetology students are not in fact employees

for purposes of Colorado's wage and hour laws.  *Indus. Comm'n v. Am. Beauty Coll., Inc*., 447 P.2d

531 (Colo. 1968).   There, the justices reviewed whether the law required "payment of wages to

tuition-paying students in licensed beauty schools."  *Id*. at 532.  The court wrote:

> Historically, students, under the supervision of licensed instructors, as part of their
> training have served customers of the beauty schools.  The customer pays a fee for
> the service to the schools, but the schools customarily do not pay the students for
> their participation in the service. . . . There is no l[a]nguage in the Cosmetology Act
> which in any manner suggests that the relationship between a beauty school and
> those enrolled for the purpose of learning the practices of cosmetology can be
> anything other than school and student.  We must, therefore, conclude that this
> precludes the relationship of master and servant or employer and employee.

*Id*. at 533.

Plaintiff acknowledges that her "Wage Claim Act claim remains actionable as long as [her]

FLSA claim remains actionable."  Response at 32 n.7.  Because the Court concludes that Plaintiff

cannot as a matter of law be considered an employee under the FLSA – or under Colorado law – the

Court will not address further this line of reasoning by the Plaintiff.  In short, as the Court holds that

the FLSA claim is not actionable, the State claims fail as well.

## CONCLUSION

The Court finds that Defendants have met their burden under Fed. R. Civ. P. 56, and Plaintiff

has failed to demonstrate the existence of triable issues of material fact, leaving no issues for a jury to decide.   Applying those undisputed material facts here, as a matter of law, Plaintiff is not an "employee" under the FLSA or Colorado wage law.   Because Plaintiff's claims against Dale L. LeMonds are identical to those against AID, the claims against both Defendants fail.   Accordingly, based upon the foregoing and the entire record herein,  Defendants' Motion for Summary Judgment [filed April 15, 2015; docket #28] is **granted**.   The Clerk of the Court is directed to close this case.

Dated at Denver, Colorado, this 30th day of July, 2015.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge